## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Andrew Ellis and Harriet A. Ellis,<br><br>Plaintiffs,<br><br>v.<br><br>The City of Minneapolis, a municipal corporation; Betsy Hodges, individually and as Mayor of the City of Minneapolis; Nuria Rivera-Vandermyde, individually and as Director of City of Minneapolis' Department of Regulatory Services; JoAnn Velde, individually and as Deputy Director of City of Minneapolis' Department of Regulatory Services; John Doe and Jane Doe, individually,<br><br>Defendants. | Case No. 14-cv-3045 (SRN/JJK)<br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

SUSAN RICHARD NELSON, United States District Judge

## I.     INTRODUCTION

This matter is before the Court on Defendants City of Minneapolis, Betsy Hodges, Nuria Rivera-Vandermyde, and JoAnn Velde's Motion for Judgment on the Pleadings [Doc. No. 23].  For the reasons set forth below, the Motion is granted with prejudice in part and granted without prejudice in part.

## II.     BACKGROUND

This lawsuit arises out of Defendant City of Minneapolis' (the "City") alleged implementation of unlawful housing policies and heightened enforcement of those policies against inner-city landlords in a discriminatory manner.  (See First Am. Compl. [Doc. No.

7] ¶ 1.)  However, this is not the first time that landlords Andrew and Harriet Ellis have sued the City.  Because their previous lawsuits are relevant to the present matter, the Court will briefly summarize those cases and their disposition.

**A.      Plaintiffs' Prior Lawsuits Against the City**

Plaintiffs first sued the City in 2011.  In that action, "Ellis I," Plaintiffs alleged that the City represented to the U.S. Department of Housing and Urban Development ("HUD") that the City was taking steps to affirmatively further fair housing when, in fact, it was not.  Ellis v. City of Mpls., No. 11-CV-0416 (PJS/TNL), 2014 WL 3928525, at *1 (D. Minn. Aug. 12, 2014) ("Ellis I").  Plaintiffs further alleged that, as a result of those false claims, the City received millions of dollars in HUD funding that it was not entitled to receive.  Id.  Accordingly, Plaintiffs brought a qui tam action under the False Claims Act to recover those funds on behalf of the United States.  Id.  In granting the City's motion to dismiss, the court determined that it lacked jurisdiction over claims based on certain of the alleged false statements for which Plaintiffs had not been the original source and, as to the remainder of the claims, that Plaintiffs failed to allege with particularity how the statements at issue were false or fraudulent.  Id. at *1–3.

Plaintiffs next sued the City in 2012.  In this second lawsuit, "Ellis II," Plaintiffs alleged that the City improperly declared one of their rental properties a nuisance and ordered its demolition after that property had been damaged in a fire in 2006.  Ellis v. City of Mpls., Civ. No. 12-57 (ADM/SER), 2012 WL 3431126, at *1 (D. Minn. Aug. 15, 2012) ("Ellis II").  Plaintiffs asserted three claims under the Fair Housing Act ("FHA"), including

disparate impact caused by a violation of the City's ministerial duty not to cause disparate impact, and retaliation for associating with protected class members. Id. at *3–4. Plaintiffs also asserted claims for negligence based on the City's response to the fire, violation of the state building code by declaring the property a nuisance, and violations of due process. Id. at *5. The City moved to dismiss, and the court determined that each of Plaintiffs' FHA claims and the negligence claim were time-barred. Id. at *3, *5. The court went on to hold that, even if the disparate impact and retaliation claims had not been untimely, they would have been subject to dismissal for failure to state a claim. Id. at *3–4. The Eighth Circuit affirmed the district court's ruling. Ellis v. City of Mpls., 518 F. App'x 502, 505 (8th Cir. 2013).

**B.     The Present Lawsuit**

In the present matter, which relates to events occurring since July 31, 2012, Plaintiffs claim that the City "has denied housing for 'protected class' members" and "violated the City's duty to Affirmatively Further Fair Housing ('AFFH') through facially neutral housing policies and actions including its illegally elevated housing standards above minimum standards and targeted and heightened enforcement, and through other punitive housing policies directed at privately owned low-income rental dwellings located in high poverty minority neighborhoods." (Id. ¶ 2.) According to Plaintiffs, Defendant Hodges is responsible for executing and enforcing the City's ordinances and housing policies, (id. ¶ 21), and is the final policymaker on issues related to the City's receipt of federal grants, funding certifications for the federal grant programs, the City's federal fair housing

obligations, and the City's housing standards and code enforcement and appeals, (id. ¶ 22). Defendant Rivera-Vandermyde is allegedly responsible for managing rental licensing and enforcing the City's housing maintenance code, for the Housing Board of Appeals, and—along with Defendant Velde—for policymaking related to the City's housing standards, code enforcement, and appeal procedures. (Id. ¶¶ 23–24.)

Plaintiffs allege that, during the relevant time period, they have owned fourteen rental dwellings in inner-city Minneapolis, which provide a total of approximately thirty-five rental units. (See id. ¶¶ 27, 36–37.) According to Plaintiffs, their rental units are located in areas where there is a high concentration of poverty and protected class members, (see id. ¶¶ 48–49, 51–53), and over sixty percent of their tenants have been African-American, nine percent Hispanic, and thirty percent White, (id. ¶ 29). Plaintiffs assert that "Whites make up 65% of the Minneapolis population and Blacks 18%," and "48.5% of Blacks in the City are very low income compared to 15.5% of Whites occupying the City." (Id. ¶¶ 38, 40; see id. ¶ 41.)

Plaintiffs contend that Minneapolis has a shortage of affordable housing, especially for protected class members, (see id. ¶¶ 54–63), and that the City has been the recipient of federal funds for the purpose of providing housing for low- and moderate-income individuals, (see id. ¶¶ 65–66). Plaintiffs claim that, as a condition of receiving these funds, the City has certified that it will comply with anti-discrimination laws, including the FHA, and that it will affirmatively further fair housing. (E.g., id. ¶¶ 68, 73, 90.) Plaintiffs allege that Minneapolis' Regulatory Services Department ("Regulatory Services"), which is

responsible for enforcing the City's housing standards through the housing maintenance code and rental licensing requirements, has received some of this federal funding.  (See id. ¶¶ 95–98.)

As a result of receiving these funds, Plaintiffs claim that the City has a duty to conduct an analysis of impediments to fair housing choice ("AI") and to act to overcome the effects of such impediments.  (E.g., id. ¶ 74.)  Plaintiffs state that the City participated in a regional AI in 2001 and, in 2002, contributed to the preparation of an AI Action Guide, but that the City did not conduct another AI until 2009.  (See id. ¶¶ 101, 107, 114.)  Plaintiffs contend that Defendants have ignored the findings of the 2001 AI and 2002 AI Action Guide, (id. ¶¶ 115–16), and that the 2009 AI does not include an analysis of how specific housing code policies or actions impact low-income or protected class housing and does not provide a clear link between the impediments identified and fair housing choice and protected class status, (see id. ¶¶ 119–26).  Plaintiffs also assert that Defendants have failed to conduct an AI directed to public sector housing policies and actions since 2009, despite HUD's recommendation that the AI be updated annually and despite Regulatory Services' heightening of housing standards and code enforcement on inner-city rental dwellings occupied by protected class members and owned by low-income housing providers.  (See id. ¶¶ 128–31.)  Plaintiffs claim that the City's failure to follow federal requirements results from a bias against rental dwellings in the inner-city.  (See id. ¶ 142.)  Nevertheless, Plaintiffs allege, the City has certified from 2012 to 2014 that it has conducted AIs and complies with its duty to affirmatively further fair housing.  (Id. ¶ 91.)

Plaintiffs also challenge the City's rental dwelling license scheme, alleging that the City has revoked numerous licenses since 1991, (id. ¶ 147), and, "[o]n information and belief, . . . [has] displaced hundreds of 'protected class' families from their rental homes since July 31, 2012," (id. ¶ 149).  Plaintiffs also state that the City "has repeatedly threatened Plaintiffs with revocation of multiple rental licenses without a lawful basis" since July 31, 2012.  (Id. ¶ 160.)  According to Plaintiffs, Regulatory Services has conducted unlawful inspections of Plaintiffs' rental dwellings, issued invalid orders and citations to Plaintiffs, issued "vague and inconsistent orders," and allowed code inspectors to use their discretion in dictating minimum housing standards.  (See, e.g., id. ¶¶ 161–62, 164, 166–68, 170–73.)  Plaintiffs state that they have responded to each of these orders by making necessary repairs, seeking clarification of the deficiency at issue, or filing appeals, (see id. ¶¶ 174, 177–78), but that Regulatory Services generally has failed to communicate with Plaintiffs in return, (see id. ¶¶ 179–83).  In some instances, however, Regulatory Services has cancelled "invalid" orders.  (See id. ¶ 184.)

According to Plaintiffs, Regulatory Services has "appl[ied] heightened housing standards beyond minimum standards and targeted and [sic] unlawful code enforcement to low-income protected class housing in the inner-city including to Plaintiffs' rental dwellings since July 30, 2012."  (Id. ¶ 100.)  For example, Plaintiffs describe written notices of code violations that were issued in September 2012 for Plaintiffs' properties located at 16th Avenue South.  (See id. ¶ 214.)  Plaintiffs claim that those notices unnecessarily required Plaintiffs to repair the roofs on those buildings, did not describe the deficiencies in sufficient

detail, and required repair of a "near-perfect" exterior wall and chimney. (See id. ¶¶ 214–16, 218–21, 225–27, 229, 231.) Plaintiffs allege that they were denied their appeal request related to the roof orders, and that the City's facially neutral policy of requiring "perfect" conditions is above minimum standards and increases costs such that it affects the cost of housing for all tenants. (See, e.g., id. ¶¶ 222, 228, 232.) In addition, Plaintiffs allege, a March 2014 written notice regarding Plaintiffs' East 26th Street property listed code deficiencies that were non-existent or not sufficiently specific. (Id. ¶ 239.) For example, Plaintiffs assert that the claimed mice infestation was not "widespread and severe" as required for extermination under the housing code, the smoke detector was operational, and a lead abatement specialist was unnecessary when there were only three small areas that needed touch-up paint. (See, e.g., id. ¶¶ 240–44.) Plaintiffs allege that their appeal requests regarding this notice were ignored, and that Regulatory Services' policies raised the minimum standards and impacted affordable housing by raising costs. (See id. ¶¶ 245–52.) Plaintiffs make similar allegations regarding "heavy code enforcement," lack of specificity, inaccuracy, and denial of appeal rights relating to June 2014 notices of claimed deficiencies at Plaintiffs' 1st Avenue property. (See id. ¶¶ 258–82.) Finally, Plaintiffs allege that Regulatory Services has failed to obtain consent to inspect certain properties, has "demanded that Plaintiff coerce consent from protected class tenants," has failed to disclose the City's "ulterior motive[]" to remove rental units from available affordable housing stock, and failed to cite Plaintiffs' tenants for violations that are the tenants' responsibility. (See id. ¶¶ 283–93.)

According to the First Amended Complaint, the City does not apply these heightened

housing standards and policies to its "sister government agency," the Minneapolis Public

Housing Agency ("MPHA")—which also provides affordable housing to low-income

individuals and protected class tenants—even though the MPHA is under-funded and has a

significant volume of code violations in its housing units.  (See id. ¶¶ 310–11, 313, 319–24.)

Rather, Plaintiffs allege, the City applies a preferential standard to the MPHA in order to

enhance MPHA's competitive position, and those standards are the City's actual "minimum

housing standards."  (See id. ¶¶ 316–18, 327.)  Plaintiffs state that a viable alternative to the

City's application of heightened standards as discussed above would have been to follow

these minimum standards or to conduct "legitimate" AIs to identify barriers to affordable

housing created by the City's policies related to the for-profit low-income rental market and

then take action to eliminate those barriers.  (See id. ¶¶ 328–30.)

As a result of application of the heightened standards, Plaintiffs claim to have

suffered interference with their business operations, loss of opportunities to rent, loss of

profits, attorney's fees, loss of opportunities to add rental units to their portfolio,

harassment, humiliation, and embarrassment.  (See id. ¶¶ 301–03.)  Plaintiffs assert that the

increase in operating costs had to be spread out over all of their units, thereby affecting the

cost of housing for all tenants, (see, e.g., id. ¶ 299), and that Defendants' actions and

heightened policies are "a significant disincentive" to continue providing low-income rental

housing in Minneapolis or to expand their portfolio in response to the high demand for such

housing, (see id. ¶¶ 304–05).  Moreover, Plaintiffs claim that after they filed this lawsuit on

July 30, 2014, Regulatory Services "commenced an increased course of intimidation and retaliation against Plaintiffs" by issuing demands for licensing inspections of seven of their rental dwellings, issuing an inspection notice for their homestead, issuing citations and fines, threatening to revoke their rental license, and denying their right to appeal certain orders.  (See id. ¶¶ 354–61, 363–68, 373–76.)

In their First Amended Complaint, Plaintiffs assert six claims against Defendants.[1] Four of these claims relate to Defendants' enforcement of allegedly "heightened" housing code standards in violation of the FHA and Defendants' duty to affirmatively further fair housing.  In Count I, Plaintiffs seek a declaratory judgment that "Minneapolis is legally bound by HUD's Disparate Impact Rule," that "Minneapolis is prohibited by its contract with HUD from challenging disparate impact unless it forgoes . . . federal funding," and that the City's obligation to affirmatively further fair housing requires it to conduct AIs pursuant to the FHA and HUD and to eliminate barriers to fair and affordable housing.  (Id. ¶¶ 384–86.)  Count II seeks injunctive relief under the FHA, prohibiting "the City's unlawfully heightened inspections and standards, heavy code enforcement, rental licensing and threats of license revocations, denial of appeal rights and other challenged housing policies and actions."  (Id. ¶ 395.)  In Count III, Plaintiffs assert disparate treatment and disparate impact claims under the FHA.  (See id. ¶¶ 401–20.)  More specifically, they allege that the City's facially-neutral housing policies and actions have blocked, denied, or impeded the provision of housing on the basis of protected status and have had a disparate impact on protected

---

[1]     Plaintiffs also initially asserted one claim against HUD and its Secretary, but those parties have been dismissed from this case [Doc. Nos. 34, 36].

classes, and that Defendants intended that the policies would have such an impact.  (See id. ¶¶ 403–05, 413.)

The remaining claims are brought specifically under 42 U.S.C. § 1983.  In Count VII,[2] Plaintiffs assert that Defendants unlawfully retaliated against them for exercising their First Amendment rights in filing this lawsuit.  (See id. ¶¶ 461–69.)  Count VIII asserts that Defendants violated Plaintiffs' due process rights under the Fourteenth Amendment by infringing upon Plaintiffs' right to pursue an occupation, right to notice, and hearing and appeal rights.  (See id. ¶¶ 470–83.)  Finally, in Count IX, Plaintiffs allege that Defendants failed to affirmatively further fair housing and engaged in discriminatory housing practices in violation of the FHA.  (Id. ¶ 485.)

Defendants answered the First Amended Complaint and subsequently filed their Motion for Judgment on the Pleadings.  The Motion was fully briefed, and the matter was heard on April 10, 2015.

## III.    DISCUSSION

Defendants have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  "Judgment on the pleadings is appropriate if there is no material issue of fact to be resolved and the moving party is entitled to judgment as a matter of law."  Buddy Bean Lumber Co. v. Axis Surplus Ins. Co., 715 F.3d 695, 697 (8th Cir. 2013).  Rule 12(c) motions are governed by the same standards that apply to motions to dismiss brought under Rule 12(b)(6) for failure to state a claim.  Gallagher v. City of

---

[2]      Plaintiffs have dropped their claims in Counts IV, V, and VI.  (See Pls.' Mem. of Law in Opp. to City Defs.' Mot. for J. on the Pleadings [Doc. No. 29] at 2.)

Clayton, 699 F.3d 1013, 1016 (8th Cir. 2012). The Court assumes the facts in the Complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff. Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986). However, the Court need not accept as true wholly conclusory allegations, see Hanten v. Sch. Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions the plaintiff draws from the facts pled, Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990). In addition, the Court ordinarily does not consider matters outside the pleadings. See Fed. R. Civ. P. 12(d). The Court may, however, consider exhibits attached to the complaint and documents that are necessarily embraced by the pleadings, Mattes v. ABC Plastics, Inc., 323 F.3d 695, 697 n.4 (8th Cir. 2003), and may also consider public records, Levy v. Ohl, 477 F.3d 988, 991 (8th Cir. 2007).

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." The U.S. Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), clarified that this Rule does not require that a complaint contain "detailed factual allegations," but it does require that it contain facts with enough specificity "to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In other words, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." Id. at 556. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Thus, to survive a

motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.

In their Motion, Defendants argue that each of Plaintiffs' claims must be dismissed for one or more of the following reasons:  res judicata, qualified immunity, or failure to plead a sufficient factual basis.  (See Defs.' Reply Mem. in Supp. of J. on the Pleadings [Doc. No. 32] ("Defs.' Reply") at 2.)  Because Plaintiffs' other causes of action are premised upon their FHA disparate impact claim, the Court will address that claim first.

## A.    Violation of the FHA (Count III)

"The Fair Housing Act . . . prohibits property owners and municipalities from blocking or impeding the provision of housing on the basis of race, color, religion, sex, familial status, or national origin."  Gallagher v. Magner, 619 F.3d 823, 831 (8th Cir. 2010) (citing 42 U.S.C. § 3604(a)–(b)).  In Count III, Plaintiffs assert claims for both disparate treatment and disparate impact under the FHA.  Regarding the disparate treatment claim, Defendants argue that they are entitled to judgment on the pleadings because "[t]he Amended Complaint is complete[ly] devoid of any factual support for the conclusory statements that the City intended for its facially neutral policies to have a discriminatory effect."  (Defs.' Mem. of Law in Supp. of Their Mot. for J. on the Pleadings [Doc. No. 26] ("Defs.' Mem.") at 15.)  Plaintiffs do not respond to this argument or make any argument in support of their disparate treatment claim.  (See Pls.' Mem. of Law in Opp. to City Defs.' Mot. for J. on the Pleadings [Doc. No. 29] ("Pls.' Opp.") at 18–30.)  Accordingly, Count III is dismissed to the extent that it alleges disparate treatment under the FHA.

Regarding the disparate impact claim, Defendants argue that they are entitled to judgment on the pleadings on grounds of res judicata, qualified immunity, and implausibility.

### 1.    Res judicata

Defendants first challenge Plaintiffs' disparate impact claim under the doctrine of res judicata.  The general rule of res judicata is:

> [W]hen a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound "not only to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."

Comm'r of Internal Revenue v. Sunnen, 333 U.S. 591, 597 (1948) (quoting Cromwell v. Cnty. of Sac, 94 U.S. 351, 352 (1876)).  Thus, a court evaluating whether res judicata applies must consider whether:  (1) there has been a final judgment on the merits of a cause of action; (2) the court that issued the judgment was of competent jurisdiction; (3) the person seeking to preclude the claim was a party or a privy to a party in the first litigation; and (4) the claim sought to be precluded either was actually litigated or is a claim that might have been offered in the first litigation.  See Lundquist v. Rice Mem'l Hosp., 238 F.3d 975, 977 (8th Cir. 2001).  In order to be barred by res judicata, a claim must "arise[] out of the same nucleus of operative fact" as the prior claim or be "based upon the same factual predicate."  Hufsmith v. Weaver, 817 F.2d 455, 461 (8th Cir. 1987) (citation and internal quotation marks omitted).  Moreover, the doctrine does not apply to claims that did not exist when the prior litigation was filed.  Lundquist, 238 F.3d at 977.

Defendants argue that Plaintiffs' claims relating to a "heightened enforcement scheme," the City's failure to affirmatively further fair housing, and the City's failure to conduct proper AIs were litigated, or could have been litigated, in Plaintiffs' previous lawsuits against Defendants—Ellis I and Ellis II.  (Defs.' Mem. at 28.)  Plaintiffs, on the other hand, argue that res judicata does not apply because the Government was the real party in interest in Ellis I, and because the present lawsuit does not arise out of the same nucleus of operative facts that was at issue in Ellis I or Ellis II.  (Pls.' Opp. at 14–15.)

The Court finds that res judicata does not apply because Plaintiffs' claims in the present lawsuit do not arise out of the same nucleus of operative fact as the prior lawsuits. As discussed above, the present lawsuit alleges that the City's heightened enforcement of its housing policies has blocked, denied, or impeded the provision of housing on the basis of protected status and has had a disparate impact on protected classes.  Ellis I and Ellis II were each based on a different factual predicate.  In Ellis I, the essence of the claim was that the City had committed fraud on the Government by improperly certifying that it was taking steps to affirmatively further fair housing—that lawsuit did not concern the heightened enforcement of the City's housing code in a discriminatory manner.  The factual predicate of Ellis II was the City's violation of the building code, and corresponding violation of its ministerial duty not to cause disparate impact, in demolishing one of Plaintiffs' rental properties after it was destroyed by fire.  Again, that lawsuit did not concern the general heightened enforcement of the City's housing code in a discriminatory manner.  Even if the factual basis of Ellis II could be considered sufficiently similar, that case concerned events

that took place in 2006, and the order dismissing that case was issued on August 15, 2012.

Thus, while some of the background facts may overlap, the alleged facts that form the basis

of Plaintiffs' present lawsuit occurred after July 30, 2012 and, therefore, could not have

been litigated in Ellis II.  Accordingly, Plaintiffs' disparate impact claim is not barred by res

judicata.[3]

## 2.    Qualified immunity

Defendants also argue that the City officials are entitled to qualified immunity.

"Qualified immunity shields government officials from liability and the burdens of litigation

. . . unless the official's conduct violates a clearly established constitutional or statutory right

of which a reasonable person would have known."  Saterdalen v. Spencer, 725 F.3d 838,

841 (8th Cir. 2013).  Thus, determining whether qualified immunity applies involves

consideration of two questions:  (1) whether the facts alleged constitute a violation of a

constitutional or statutory right; and (2) whether that right was "clearly established" at the

time of the alleged violation.  LaCross v. City of Duluth, 713 F.3d 1155, 1157–58 (8th Cir.

2013) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  "Unless the answer to both of

these questions is yes, the defendants are entitled to qualified immunity."  Krout v.

Goemmer, 583 F.3d 557, 564 (8th Cir. 2009).

---

[3]    In their reply brief, Defendants argue that the administrative exhaustion doctrine also bars all claims that were previously litigated or that could have been litigated. (Defs.' Reply at 3, 7–8.)  The Court declines to address this argument for two reasons. First, it was raised for the first time in the reply brief.  Second, Defendants only argue that Plaintiffs' failure to appeal the validity of certain citations has rendered those citations valid.  (Id. at 7–8.)  However, Defendants do not specify the particular citations to which they are referring and, at any rate, Plaintiffs' claim is based on more than the issuance of citations.

Defendants assert that the City officials are entitled to qualified immunity because the enforcement of the City's housing code, including the issuance of citations, is a discretionary government function. (Defs.' Mem. at 49–50.) According to Defendants, Plaintiffs have no right to be free from receiving incorrect citations. (Id. at 50.) Plaintiffs, on the other hand, argue that the Eighth Circuit's decision in Gallagher v. Magner, 619 F.3d 823 (8th Cir. 2010), clearly established that implementation of housing code standards and enforcement actions similar to those at issue constitute violations of the FHA and, at the very least, Plaintiffs should be permitted to conduct discovery on the issue of immunity. (Pls.' Opp. at 63.)

The Court declines to rule on the availability of qualified immunity at this stage of the proceedings. As discussed in more detail below, the facts alleged are not sufficient to state a claim for violation of the FHA. That being said, the Court is permitting Plaintiffs one last opportunity to re-plead their claim. Therefore, it is not clear whether the answer to the first question in the qualified immunity test will be "yes." If Plaintiffs choose to re-plead their claim, Defendants may again raise their qualified immunity defense. If Plaintiffs do not re-plead their claim, it will be dismissed with prejudice and the issue of immunity will be rendered moot.

### 3. Plausibility

Finally, Defendants contend that Plaintiffs have failed to plead sufficient facts to support their disparate impact claim. While Defendants' Motion was pending, the U.S. Supreme Court in Texas Department of Housing & Community Affairs v. Inclusive

Communities Project, Inc., 135 S. Ct. 2507, 2525 (2015), confirmed that disparate impact claims are cognizable under the FHA. In that case, the plaintiffs alleged that the defendant had caused segregated housing patterns by granting too many tax credits for housing in predominantly black inner-city neighborhoods and too few in predominantly white suburban neighborhoods. Id. at 2514. Relying on two pieces of statistical evidence, the district court found that the plaintiffs had established a prima facie case of disparate impact. Id. The district court then concluded that, although the defendant's proffered interests in allocating tax credits in its chosen manner were legitimate and sufficient to rebut the plaintiffs' prima facie case, the defendant had not met its burden of proving that there were no less discriminatory alternatives. Id.

While the defendant's appeal was pending, HUD issued a regulation interpreting the FHA to protect against disparate impact and establishing a three-part burden-shifting framework for adjudicating such claims. Id. As summarized by the Supreme Court:

> Under the regulation, a plaintiff first must make a prima facie showing of disparate impact. That is, the plaintiff "has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." 24 CFR § 100.500(c)(1) (2014). If a statistical discrepancy is caused by factors other than the defendant's policy, a plaintiff cannot establish a prima facie case, and there is no liability. After a plaintiff does establish a prima facie showing of disparate impact, the burden shifts to the defendant to "prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." § 100.500(c)(2). . . . Once a defendant has satisfied its burden at step two, a plaintiff may "prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." § 100.500(c)(3).

Id. at 2514–15.  The Fifth Circuit Court of Appeals subsequently held that disparate impact claims are recognized under the FHA and, applying the HUD regulation, determined that the district court erred in placing the burden on the defendant to prove that there were no less discriminatory alternatives for allocating the tax credits.  Id. at 2515.

The Supreme Court granted certiorari on the question of whether disparate impact claims are cognizable under the FHA.  Id.  In holding that they are recognized, the Court announced several "cautionary standards."  Id. at 2524.  First, the Court noted that liability under the FHA cannot be imposed solely on a showing of statistical disparity.  See id. at 2522.  Thus, "[c]ourts must . . . examine with care whether a plaintiff has made out a prima facie case of disparate impact . . . . A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact."  Id. at 2523.  "[This] robust causality requirement ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create."  Id. (quoting Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 653 (1989)).

Second, governmental entities "must not be prevented from achieving legitimate objectives, such as ensuring compliance with health and safety codes."  Id. at 2524.  Thus, "[g]overnmental . . . policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers,'" id. (quoting Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971)), and "housing authorities and private developers [must be given] leeway to state and explain the valid interest served by their policies," id. at 2522.

Finally, "before rejecting a business justification—or, in the case of a governmental entity, an analogous public interest—a court must determine that a plaintiff has shown that there is 'an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs.'" Id. at 2518 (quoting Ricci v. DeStefano, 557 U.S. 577, 578 (2009)). As the Supreme Court stated, "[w]ere standards for proceeding with disparate-impact suits not to incorporate at least [these] safeguards . . . , then disparate-impact liability might displace valid governmental and private priorities . . . ." Id. at 2524. Defendants argue that Plaintiffs' claim fails at each step of the analysis. (Defs.' Mem. at 16.)

### a.  Prima facie case

First, according to Defendants, Plaintiffs have failed to plead a prima facie case of disparate impact because they do not allege facts to show that: any tenant was displaced, any policy had a significant adverse impact upon a protected class member, they lost the ability to rent to tenants, the City has a high volume of false assertions of code violations, no other landlord will purchase the properties that Plaintiffs choose not to purchase, or how the housing code was elevated or in what ways the City's orders were vague. (See id. at 16–21.) Defendants also argue that Plaintiffs have not alleged statistics demonstrating an inference of disparate impact because the First Amended Complaint only contains statistics regarding Plaintiffs' own tenants and not the impact upon protected classes compared to the relevant population. (Id. at 20–22.)

In opposition, Plaintiffs assert that they have identified a facially-neutral policy or practice that had a significant adverse impact on protected class members, and they point to

their allegations that:  (1) the City and Regulatory Services required Plaintiffs to meet elevated standards above minimum housing standards; (2) Regulatory Services fails to specify claimed code deficiencies and the required remedial action; (3) Regulatory Services targets privately-owned, low-income rental dwellings; (4) Regulatory Services fails to provide due process; (5) Regulatory Services fails to adequately train its inspectors; (6) the City has failed to conduct an analysis of impediments to fair housing choice since 2001 or to take action to eliminate impediments; (7) Regulatory Services holds housing providers, rather than tenants, responsible for all deficiencies; (8) Regulatory Services threatens civil and criminal penalties based on admitted or unlawful orders and citations; (9) Regulatory Services refuses to communicate with housing providers; and (10) the City requires all housing to be in a perfect state of repair.  (See, e.g., First Am. Compl. ¶¶ 403; Pls.' Opp. at 20.)  According to Plaintiffs, they have sufficiently alleged resulting injuries, including that housing units remain vacant, Plaintiffs have suffered lost profits, and Plaintiffs have a lesser ability and incentive to provide low-income housing.  (Pls.' Opp. at 21–24.)  Finally, Plaintiffs contend that they have "pled sufficient plausible facts that in Minneapolis, protected class members have been and continue to be disproportionately impacted by the City's affordable housing crisis, and protected class members are vulnerable to such policies which disproportionately impact their fair housing choice."  (Id. at 25.)

The Court finds that Plaintiffs have failed to adequately plead a prima facie case of disparate impact.  Even assuming, without ruling, that the statistics alleged in the First Amended Complaint demonstrate that protected class members are disproportionately

20

impacted by policies that reduce the availability of low-income housing in the City, allegations of a statistical disparity alone are insufficient to make out a prima facie case. Rather, Plaintiffs also must allege facts that plausibly demonstrate a causal link between the challenged policy and that disparity. Tex. Dep't of Hous., 135 S. Ct. at 2523; see Gallagher, 619 F.3d at 836 n.4 ("[M]erely showing that there is a shortage of housing accessible to a protected group is insufficient to establish a prima facie case for a disparate impact claim. Plaintiffs must also show that such a shortage is causally linked to a neutral policy, resulting in a disproportionate adverse effect on the protected population.").

Plaintiffs have failed to do so. Although Plaintiffs allege generally that, as a result of the City's application of heightened standards, they have incurred increased operating costs that must be passed on to their tenants and that they no longer have an incentive to continue providing low-income housing or to expand their portfolio, Plaintiffs have not alleged, with sufficient factual support, that they have been prevented from renting any of their units or that any tenants have been displaced. Accordingly, the First Amended Complaint contains no plausible allegations that the City's alleged heightened enforcement of the housing code has caused any adverse impact on a protected class and thus, fails to make out a prima facie case of disparate impact.

**b.** **Legitimate interests**

Second, Defendants argue that "[t]he City's housing policies have a 'manifest relationship' to legitimate, non-discriminatory policy objectives and are necessary to the attainment of such objectives," which include providing minimum property maintenance

standards to ensure a basic standard of living, keeping the City clean and safe, and keeping housing habitable. (Defs.' Mem. at 23–24.) However, Plaintiffs argue that Defendants will fail to meet their burden at this second stage of the disparate impact analysis because they cannot demonstrate that the challenged housing policies and actions are necessary to promote a "compelling government interest." (Pls.' Opp. at 27.) They also argue that the City's failure to conduct an AI should defeat the City's claim in light of its duty to affirmatively further fair housing and its knowledge of the protected class's need for housing. (Id. at 28.)

Contrary to Plaintiffs' argument, it is clear in light of Texas Department of Housing that Defendants need only demonstrate the existence of a "legitimate" government interest—not a "compelling" government interest—and that "ensuring compliance with health and safety codes" qualifies as such. 135 S. Ct. at 2524; see Gallagher, 619 F.3d at 837 (finding that "the objectives of providing minimum property maintenance standards, keeping the City clean and housing habitable, and making the City's neighborhoods safe and livable" were "legitimate, non-discriminatory objectives"). In addition, Plaintiffs' argument that the City's failure to conduct an AI in light of its duty to affirmatively further fair housing simply re-hashes their arguments from stage one of the burden-shifting analysis and is irrelevant as to whether the interests that the City is pursuing are legitimate. Thus, although Plaintiffs do not concede that Defendants can meet their burden, (see Pls.' Opp. at 27), neither have they alleged any facts plausibly showing that Defendants cannot.

Accordingly, Defendants have demonstrated that they will be able to satisfy their burden under this prong of the analysis.

### c.      Alternative practice

Finally, Defendants assert that Plaintiffs cannot, and do not, assert any viable alternative means for the City to accomplish its policy objectives because MPHA's properties are HUD-owned and so are immune from the City's nuisance ordinances, there is no significant difference between the City's current and past housing policies that would render the old policies preferable, and it would be unfair and infeasible for the City to cite the tenants rather than the landlords for housing violations.  (See Defs.' Mem. at 25–28.)  In response, Plaintiffs argue that they have sufficiently pled a viable and less discriminatory alternative that meets the City's needs—i.e., "actually complying with the City's own Codes and the State Building Code."  (Pls.' Opp. at 28.)  Plaintiffs also point to their allegations that the City would have discovered other viable alternatives if it had conducted AIs and kept records while taking actions to eliminate impediments to housing.  (Id. at 28–29.)

The Court agrees that the First Amended Complaint does not sufficiently allege the existence of any viable alternatives that would have less disparate impact.  First, the only actual suggested alternative is compliance with the City's current codes—mere speculation that other alternatives "would have" been discovered not only fails to identify with any specificity what those alternatives might be, but also fails to identify how those alternatives would cause less disparate impact.  Second, Plaintiffs' allegation that the City could follow its current codes is too vague to support a plausible claim.  The only purported definition of

these "minimum" housing standards is based on a comparison to the MPHA units' "normal state of repair and disrepair and needed maintenance and improvements that are typical for a low-income housing provider with older housing stock." (Id. ¶ 326; see id. ¶ 327 ("MPHA's 'high performer' status with HUD in light of the actual physical deterioration of its physical inventory, demonstrates that those actual conditions are the 'minimum housing standards' applied to MPHA and acceptable to Minneapolis for its own public rental portfolio.").) Such an ambiguous standard can hardly be considered viable. Plaintiffs also have not alleged any facts to support the notion that the alleged discriminatory impact would be lessened by application of these "minimum" housing standards. For example, Plaintiffs have alleged no plausible facts to support the conclusion that they would not incur costs in complying with or defending against enforcement of the minimum standards. Thus, Plaintiffs have failed to allege any plausible or viable alternative means for the City to accomplish its legitimate policy objectives.

In light of the cautionary standards enunciated in Texas Department of Housing, this Court finds that the facts alleged in the First Amended Complaint are wholly insufficient to raise a reasonable expectation that discovery would reveal evidence of disparate impact under the FHA. However, because that opinion was issued after this Motion was taken under advisement, the Court will permit Plaintiffs thirty days to file an amended complaint that attempts to cure the deficiencies noted herein. Accordingly, Count III is dismissed without prejudice. If Plaintiffs fail to file a Second Amended Complaint within 30 days of the date of this Order, Count III will be dismissed with prejudice.

## B.    Declaratory Judgment (Count I)

As discussed above, Count I seeks a declaratory judgment that:  (1) the City is bound by HUD's disparate impact rule; (2) the City is prohibited by its contract with HUD from challenging disparate impact unless it forgoes federal funding; and (3) the City's obligation to affirmatively further fair housing requires it to conduct AIs pursuant to the FHA and HUD and to eliminate barriers to fair and affordable housing.  (First Am. Compl. ¶¶ 384–86.)  Under the Declaratory Judgment Act, federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  Federal courts, however, "only have jurisdiction to hear actual cases and controversies."  Cnty. of Mille Lacs v. Benjamin, 361 F.3d 460, 463 (8th Cir. 2004) (citing U.S. Const. art. III, § 2, cl. 1).  In order to qualify as an actual case or controversy, "the dispute [must] be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and [it must] be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'"  MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007) (citation omitted).

In their Motion, Defendants argue that Count I fails because Plaintiffs have improperly conflated a legal argument about whether a disparate impact claim is cognizable under the FHA (made by Defendants in a previous case) with whether Defendants in fact have followed the disparate impact rule.  (Defs.' Mem. at 32–33.)  Defendants also argue that Plaintiffs' request related to AIs is barred by res judicata and is inappropriate for

declaratory relief because an AI may not lead to any viable alternatives with which

Plaintiffs would be satisfied and so the requested declaration would not end the controversy.

(Defs.' Reply at 14–15.)  In opposition, Plaintiffs merely repeat the relief they are seeking,

summarizing it as "a declaration by this Court of the City's federal and Fair Housing

obligations."  (Pls.' Opp. at 41.)

 The Court finds that Plaintiffs have not stated a proper claim for declaratory relief

because they are not seeking resolution of an actual case or controversy.  A declaration from

this Court that Defendants are "bound by" HUD's regulations or that delineates the City's

obligations under the FHA to affirmatively further fair housing would constitute an

impermissible advisory opinion on the authoritative value of a particular regulation, or an

explanation of what the law is, rather than an application of law to a particular set of facts.

Moreover, the notion that the City is prohibited by its contract from challenging disparate

impact is not only incorrect, but also moot.  The contract simply states that "'[t]he grant will

be conducted and administered in conformity with . . . the Fair Housing Act (42 U.S.C.

3601-3619), and implementing regulations.'"  (First Am. Compl. ¶ 68 (quoting id., Ex. A

(Local Grantee Certifications) at 3).)  The contract does not prohibit any party from making

legal arguments as to the meaning of the FHA or its implementing regulations.  Moreover,

in light of the Supreme Court's holding in Texas Department of Housing, it is now clear that

a claim for disparate impact is cognizable under the FHA.  Accordingly, there is no actual

case or controversy presented in Plaintiffs' claim for declaratory relief, and Count I is

dismissed.

## C.      Injunctive Relief (Count II)

In Count II, Plaintiffs seek injunctive relief pursuant to 42 U.S.C. § 3613 prohibiting the City and its employees from continuing the alleged wrongful conduct.  (See First Am. Compl. ¶ 396.)  Section 3613, however, merely lists the types of remedies that are available to a prevailing plaintiff in a civil action brought under the FHA:

> In a civil action under subsection (a) of this section, if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d) of this section, may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

42 U.S.C. § 3613(c)(1).  Accordingly, as Plaintiffs acknowledge, to "prevail" on Count II would require a finding of a discriminatory housing practice under Count III.  (See Pls.' Opp. at 38.)  Because Count II is concededly not an independent cause of action and is dependent upon the outcome of Count III, it too will be dismissed without prejudice at this juncture.  Likewise, if Plaintiffs fail to file a Second Amended Complaint addressing the deficiencies in Count III within 30 days of the date of this Order, Count II will be dismissed with prejudice.

## D.      First Amendment Retaliation (Count VII)

Defendants also seek dismissal of Plaintiffs' First Amendment retaliation claim.  "It is well-settled that 'as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . on the basis of his constitutionally protected speech.'"  Osborne v. Grussing, 477 F.3d 1002, 1005 (8th Cir. 2007) (quoting

Hartman v. Moore, 547 U.S. 250, 256 (2006)).  "To successfully plead a First Amendment retaliation claim, a plaintiff must plausibly plead that he/she 'engaged in protected activity and that defendants, to retaliate for the protected activity, took adverse action against [him/her] that would chill a person of ordinary firmness from engaging in that activity.'" Zutz v. Nelson, 601 F.3d 842, 848–49 (8th Cir. 2010) (quoting Lewis v. Jacks, 486 F.3d 1025, 1028 (8th Cir. 2007)).  In addition, "[t]he defendant's retaliatory motive must be a but-for cause of the retaliation; a plaintiff cannot recover if the defendant would have taken the same adverse action even in the absence of the improper motive."  Gearin v. City of Maplewood, 780 F. Supp. 2d 843, 856 (D. Minn. 2011) (citing Osborne, 477 F.3d at 1006). As stated by the Eighth Circuit in Osborne v. Grussing:

> [A] plaintiff who seeks relief from valid adverse regulatory action on the ground that it was unconstitutional retaliation for First Amendment-protected speech must make the same showing that is required to establish a claim of selective prosecution—"that he has been singled out for prosecution while others similarly situated have not been prosecuted for conduct similar to that for which he was prosecuted [and] that the government's discriminatory selection of him for prosecution was based upon . . . his exercise of his first amendment right to free speech."

477 F.3d at 1006 (quoting United States v. Catlett, 584 F.2d 864, 866 (8th Cir. 1978)).

Defendants challenge the sufficiency of Plaintiffs' pleadings regarding causation, arguing that, although Plaintiffs have alleged that the City commenced an increased course of retaliation against them by issuing demands for licensing inspections on their properties, Plaintiffs have failed to allege that those inspections were unique to Plaintiffs.  (Defs.' Mem. at 45.)  On the contrary, Defendants assert, the inspections at issue were planned since 2011.  (Id.)  Defendants also argue that, despite Plaintiffs' allegations that Defendants

denied their right to appeal, Plaintiffs were not denied due process.  (Id.; Defs.' Reply at 17.)

Plaintiffs, on the other hand, appear to argue that the standard in Osborne applies only if the regulatory action at issue is admitted to be "valid" and that this Court should instead apply the causation standard articulated by the Eighth Circuit in Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004)—i.e., that "the adverse action was motivated at least in part by the exercise of the protected activity."  (Pls.' Opp. at 44.)  According to Plaintiffs, the following allegations are sufficient:  Defendants commenced an increased course of retaliation against Plaintiffs "shortly after" they filed this lawsuit by subjecting several of Plaintiffs' properties to inspection and denying Plaintiffs their appeal rights, the Housing Board of Appeals members insulted Plaintiffs' attorney, Defendants issued Plaintiffs citations and fines for failure to comply with the City's orders, and Defendants' actions were taken with an intent to retaliate.  (See id. at 45–48.)

The Court finds that Plaintiffs' claim must be dismissed for failure to plead facts sufficient to demonstrate that they will be able to establish causation.  First, the causation standard as articulated by the Eighth Circuit in Osborne, rather than in Revels, applies in this lawsuit challenging Defendants' regulatory enforcement actions.  Although the Osborne court stated the causation rule in terms of plaintiffs who seek relief from "valid" regulatory action, the court explicitly stated that it was crafting a standard specific to the type of case before it—which involved plaintiffs who admitted that they had violated the regulations at issue.  477 F.3d at 1006.  Plaintiffs have not explained why the same type of standard would

not apply in regulatory enforcement actions where the plaintiff is also challenging the validity of the regulatory enforcement itself.

Second, even under Revels, "[a] plaintiff must show he was 'singled out because of [his] exercise of constitutional rights.'" Peterson v. Kopp, 754 F.3d 594, 602 (8th Cir. 2014) (citation and internal quotation marks omitted) (describing the causation prong of the test articulated in Revels). Plaintiffs' allegations demonstrate the contrary. In particular, Plaintiffs allege that: Defendants announced prior to the filing of Plaintiffs' Complaint that they were increasing their enforcement efforts and that the increase would affect hundreds of property owners, (see First Am. Compl. ¶¶ 152–53, 235–36); other low-income housing providers have been faced with license revocation proceedings, (see id.¶¶ 154–57); Defendants have, from July 31, 2012 through present, issued vague orders not in compliance with the City's code to other low-income housing providers, (see id. ¶¶ 165–66); and Defendants have refused to communicate "with many property owners and rental housing providers in the City," (id. ¶ 181; see id. ¶ 186). These allegations refer to a continuous stream of demands for licensing inspections, denials of appeal rights, and issuance of fines and citations beginning on July 30, 2012—long before Plaintiffs filed their Complaint—and, therefore, are contrary to the notion that Defendants took the alleged retaliatory actions because Plaintiffs filed this lawsuit. In addition, these allegations demonstrate that the same actions were taken against numerous property owners, not just Plaintiffs. Because Plaintiffs have failed to allege facts that, if true, could support a finding of but-for causation, their First Amendment retaliation claim must be dismissed.

### E.     Due Process (Count VIII)

Defendants next seek dismissal of Plaintiffs' Fourteenth Amendment due process

claim.  In Count VIII, Plaintiffs assert that they were deprived of their liberty interest in "the

freedom . . . to choose and pursue a career [and] to engage in any of the common

occupations of life."  (First Am. Compl. ¶ 471.)  They allege that Defendants interfered with

those constitutional rights and, by denying their appeal and hearing requests, did "not

afford[] Plaintiffs adequate procedural rights prior to depriving them of their protected

interest."  (Id. ¶ 481.)  While it is not clear from the face of the First Amended Complaint

whether Plaintiffs are asserting a substantive or procedural due process claim, Plaintiffs

argue in their briefing on this Motion only that they were denied procedural due process.

(See Pls.' Opp. at 48–62.)

In that regard, Defendants argue that Count VIII fails because Plaintiffs have not

cited to any binding authority for the proposition that they have a protectable liberty interest

in private sector careers, and because they have not adequately alleged that they were

actually deprived of their occupation as landlords.  (Defs.' Reply at 17.)  In addition,

Defendants argue that no pre-deprivation hearing was required in light of the City's

important government interest in ensuring that housing is safe.  (Defs.' Mem. at 47–48.)

Plaintiffs, on the other hand, argue that the freedom to choose and pursue a career is a

liberty interest that may not be arbitrarily denied by the government, and that the City

unlawfully deprived them of their due process rights by denying their appeal and hearing

requests on four separate occasions.  (See Pls.' Opp. at 49–61.)

The Fourteenth Amendment prohibits state action that "deprive[s] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Courts analyzing a procedural due process claim consider two questions: (1) whether state action has deprived the plaintiff of a protected interest; and if so, (2) whether sufficient procedural safeguards for challenging the deprivation were available. Keating v. Neb. Pub. Power Dist., 660 F.3d 1014, 1017 (8th Cir. 2011). In other words, "[t]he possession of a protected life, liberty, or property interest is . . . a condition precedent to the government's obligation to provide due process of law." Movers Warehouse, Inc. v. City of Little Can., 71 F.3d 716, 718 (8th Cir. 1995). Thus, "[u]nless there has been a deprivation [of a protected liberty or property interest] by state action, the question of what process is required . . . is irrelevant, for the constitutional right to due process is simply not implicated." Iota Xi Chapter of Sigma Chi Fraternity v. Patterson, 566 F.3d 138, 146 (4th Cir. 2009) (citation and internal quotation marks omitted; ellipsis and alterations in original).

In regard to the particular liberty interest at issue in this case—i.e., in choosing and pursuing an occupation—the Eighth Circuit has stated:

> "The Constitution only protects [the] liberty [to follow a chosen profession free from unreasonable governmental interference] from state actions that threaten to deprive persons of the right to pursue their chosen occupation. State actions that exclude a person from one particular job are not actionable in suits . . . . It is the liberty to pursue a particular calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment."

Habhab v. Hon, 536 F.3d 963, 968 (8th Cir. 2008) (quoting Piecknick v. Pennsylvania, 36 F.3d 1250, 1259–60 (3d Cir. 1994)). Applying these principles in Habhab v. Hon, the court found that the owner of a towing company had not been deprived of his right to pursue his

chosen occupation even where the defendants "encouraged potential customers to hire other tow truck companies, ordered [the plaintiff] to leave a towing site despite having been retained, and threatened [the plaintiff] with criminal charges if he continued to follow his business practices." Id. at 966. Likewise, in Khan v. Bland, the Seventh Circuit found that a landlord who was barred from participating in a Section 8 program was not precluded from pursuing his occupation because he could continue renting units to non-Section 8 tenants and had not been put out of business. 630 F.3d 519, 534–35 (7th Cir. 2010).

Plaintiffs have failed to sufficiently plead a violation of their due process rights. Although Plaintiffs assert that they have received fines, citations, and threats of adverse action from Defendants, and that some of their units have remained vacant, they do not allege that their rental license was ever revoked or that they have otherwise been prevented from continuing in their occupation as landlords. (See Pls.' Opp. at 48–62.) Accordingly, the facts pled do not support a plausible claim that Plaintiffs were deprived of any alleged liberty interest in pursuing their chosen occupation, and Plaintiffs' claim for relief under the Fourteenth Amendment fails. Count VIII is dismissed.

## F. Duty to Affirmatively Further Fair Housing (Count IX)

Aside from incorporating by reference the previous paragraphs of the First Amended Complaint, and stating the nature of the alleged damages, the entirety of Count IX reads:

> Defendant City has failed affirmatively to further fair housing, in violation of 42 U.S.C. Section 3608 and 24 C.F.R. § 1, et seq., by engaging in racially discriminatory housing practices, including by causing and increasing segregation.

(First Am. Compl. ¶ 485.)  In their brief in opposition to this Motion, Plaintiffs argue that the "duty to affirmatively further fair housing" consists of a duty to "'administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of [42 U.S.C. §§ 3601–3619].'"  (Pls.' Opp. at 30 (quoting 42 U.S.C. § 3608(e)(5)).)  They further assert that numerous courts have applied this duty to state and local agencies, and that Defendants have violated their duty by failing to conduct AIs, applying housing policies in a manner that is detrimental to Plaintiffs' ability to provide affordable housing to protected class members, violating Plaintiffs' First and Fourteenth Amendment rights, and trying to prohibit private investors from purchasing vacant homes for rental dwellings.  (See id. at 30–38.)  Defendants, on the other hand, argue that Count IX should be dismissed because the allegations relating to the production of AIs are barred by res judicata, and because the allegations pertaining to segregation are unsupported or at least duplicative of Plaintiffs' disparate impact claim.  (Defs.' Mem. at 48–49.)

The Court agrees with Defendants that this claim is duplicative and must be dismissed.  In Gallagher, owners of low-income rental housing located in St. Paul, Minnesota brought a lawsuit against the City of St. Paul based on its allegedly "aggressive enforcement" of its housing code.  619 F.3d at 833.  The landlords asserted several claims against the City of St. Paul, including claims for disparate impact under the FHA and for failure to affirmatively further fair housing by neglecting to analyze impediments to fair housing.  See id. at 831–40.  Although the Eighth Circuit ultimately concluded that the

landlords' disparate impact claim should have survived summary judgment, it affirmed the district court's dismissal of the failure to affirmatively further fair housing claim because that claim "ha[d] no independent significance." Id. at 839 (citing Charleston Hous. Auth. v. U.S. Dep't of Agric., 419 F.3d 729, 740 (8th Cir. 2005); Langlois v. Abington Hous. Auth., 234 F. Supp. 2d 33, 72–73 (D. Mass. 2002)).

Similarly, here, Plaintiffs' claim for failure to affirmatively further fair housing has no independent significance from their disparate impact claim. Their allegations that Defendants failed to conduct AIs, applied housing policies in a manner that is detrimental to Plaintiffs' ability to provide affordable housing to protected class members, and tried to prohibit private investors from purchasing vacant homes for rental dwellings are the same allegations that support their disparate impact claim. In addition, the Court has already determined that Plaintiffs have not adequately stated claims for violation of their First and Fourteenth Amendment rights. Accordingly, those claims cannot form the basis of their claim for failure to affirmatively further fair housing. For these reasons, Count IX is dismissed.

## IV.    ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. Defendants City of Minneapolis, Betsy Hodges, Nuria Rivera-Vandermyde, and JoAnn Velde's Motion for Judgment on the Pleadings [Doc. No. 23] is **GRANTED IN PART AND GRANTED WITHOUT PREJUDICE IN PART**;

2. Counts I, IV, V, VI, VII, VIII, and IX are **DISMISSED WITH PREJUDICE**;

3. Count III is **DISMISSED WITH PREJUDICE** to the extent that it is based on a claim of disparate treatment;

4. Count III is **DISMISSED WITHOUT PREJUDICE** to the extent that it is based on a claim of disparate impact;

5. Count II is **DISMISSED WITHOUT PREJUDICE** to the same extent as Count III; and

6. Plaintiffs have 30 days from the date of this Order to file a Second Amended Complaint re-pleading their disparate impact claim in Count III consistent with U.S. Supreme Court authority, as discussed herein. If Plaintiffs fail to file a Second Amended Complaint within 30 days, Counts II and III will be dismissed with prejudice. If Plaintiffs do file a Second Amended Complaint in accordance with this Order, Defendants will be permitted an opportunity to challenge the sufficiency of the amended pleading if they so choose.

Dated: August 24, 2015                     s/Susan Richard Nelson
                                           SUSAN RICHARD NELSON
                                           United States District Judge