UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Andrew Ellis and Harriet A. Ellis,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>The City of Minneapolis, a municipal corporation; Betsy Hodges, individually and as Mayor of the City of Minneapolis; Nuria Rivera-Vandermyde, individually and as Director of City of Minneapolis' Department of Regulatory Services; and JoAnn Velde, individually and as Deputy Director of City of Minneapolis' Department of Regulatory Services,<br><br>　　　　　　Defendants. | Case No. 14-cv-3045 (SRN/SER)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

John R. Shoemaker, Shoemaker & Shoemaker, P.L.L.C., Highland Bank Building, Suite 410, 5270 West 84th Street, Bloomington, Minnesota 55437, for Plaintiffs.

Sarah C.S. McLaren and Tracey Fussy, Minneapolis City Attorney's Office, 350 S. Fifth Street, Suite 210, Minneapolis, Minnesota 55415, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

## I.   INTRODUCTION

This matter is before the Court on Defendants' Motion for Judgment on the Pleadings [Doc. No. 40]. For the reasons set forth below, the Motion is granted.

## II.   BACKGROUND

This lawsuit arises out of Defendant City of Minneapolis' (the "City") alleged implementation of unlawful housing policies and heightened enforcement of those policies

against inner-city landlords in a discriminatory manner.  (See Second Am. Compl. [Doc. No. 38] ¶¶ 1–2.)  The matter before the Court concerns the viability of Plaintiffs' Second Amended Complaint.  To provide context for this ruling, the Court will first summarize Plaintiffs' First Amended Complaint and the disposition of Defendants' first motion for judgment on the pleadings, to the extent that they are relevant.

### A.     Plaintiffs' First Amended Complaint

In their First Amended Complaint, Plaintiffs claimed that the City "has denied housing for 'protected class' members" and "violated the City's duty to Affirmatively Further Fair Housing ('AFFH') through facially neutral housing policies and actions including its illegally elevated housing standards above minimum standards and targeted and heightened enforcement, and through other punitive housing policies directed at privately owned low-income rental dwellings located in high poverty minority neighborhoods."  (First Am. Compl. [Doc. No. 7] ¶ 2.)  Plaintiffs alleged that, during the relevant time period, they owned fourteen rental dwellings in inner-city Minneapolis, with a total of approximately thirty-five rental units.  (See id. ¶¶ 27, 36–37.)  According to Plaintiffs, these rental units are located in areas where there is a high concentration of poverty and protected class members, (see id. ¶¶ 48–49, 51–53), and over sixty percent of their tenants have been African-American, nine percent Hispanic, and thirty percent White, (id. ¶ 29).  Plaintiffs asserted that "Whites make up 65% of the Minneapolis population and Blacks 18%," and "48.5% of Blacks in the City are very low income compared to 15.5% of Whites occupying the City."  (Id. ¶¶ 38, 40; see id. ¶ 41.)

Plaintiffs further contended that Minneapolis has a shortage of affordable housing, especially for protected class members, (see id. ¶¶ 54–63), and that the City has been the recipient of federal funds for the purpose of providing housing for low- and moderate-income individuals, (see id. ¶¶ 65–66).  Plaintiffs claimed that, as a condition of receiving these funds, the City certified that it will comply with anti-discrimination laws, including the Fair Housing Act ("FHA"), and that it will affirmatively further fair housing.  (E.g., id. ¶¶ 68, 73, 90.)  Thus, Plaintiffs claimed, the City has a duty to conduct an analysis of impediments to fair housing choice ("AI") and to act to overcome the effects of such impediments.  (E.g., id. ¶ 74.)  Plaintiffs stated that the City participated in a regional AI in 2001 and, in 2002, contributed to the preparation of an AI Action Guide, but that the City did not conduct another AI until 2009.  (See id. ¶¶ 101, 107, 114.)  Plaintiffs stated that Defendants have ignored the findings of the 2001 AI and 2002 AI Action Guide, (id. ¶¶ 115–16), and that the 2009 AI was inadequate, (see id. ¶¶ 119–26).  Plaintiffs also asserted that Defendants have failed to conduct an AI directed to public sector housing policies and actions since 2009, despite the U.S. Department of Housing and Urban Development's ("HUD") recommendation that the AI be updated annually and despite the Minneapolis Regulatory Services Department's ("Regulatory Services") heightening of housing standards and code enforcement on inner-city rental dwellings occupied by protected class members and owned by low-income housing providers.  (See id. ¶¶ 128–31.)  Plaintiffs claimed that the City's failure to follow federal requirements results from a bias against rental dwellings in the inner-city.  (See id. ¶ 142.)

3

Plaintiffs also challenged the City's rental dwelling license scheme, alleging that the City revoked numerous licenses since 1991, (id. ¶ 147), and, "[o]n information and belief, . . . displaced hundreds of 'protected class' families from their rental homes since July 31, 2012," (id. ¶ 149). And, Plaintiffs stated that the City "repeatedly threatened Plaintiffs with revocation of multiple rental licenses without a lawful basis" since July 31, 2012. (Id. ¶ 160.) According to Plaintiffs, Regulatory Services conducted unlawful inspections of Plaintiffs' rental dwellings, issued invalid orders and citations to Plaintiffs, issued "vague and inconsistent orders," and allowed code inspectors to use their discretion in dictating minimum housing standards. (See, e.g., id. ¶¶ 161–62, 164, 166–68, 170–73.) Plaintiffs stated that they have responded to each of these orders by making necessary repairs, seeking clarification of the deficiency at issue, or filing appeals, (see id. ¶¶ 174, 177–78), but that Regulatory Services generally has failed to communicate with Plaintiffs in return, (see id. ¶¶ 179–83).

According to Plaintiffs, Regulatory Services "appl[ied] heightened housing standards beyond minimum standards and targeted and [sic] unlawful code enforcement to low-income protected class housing in the inner-city including to Plaintiffs' rental dwellings since July 30, 2012." (Id. ¶ 100.) For example, Plaintiffs described written notices of code violations that were issued in September 2012 for Plaintiffs' properties located at 16th Avenue South. (See id. ¶ 214.) Plaintiffs claimed that those notices unnecessarily required Plaintiffs to repair the roofs on those buildings, did not describe the deficiencies in sufficient detail, and required repair of a "near-perfect" exterior wall and chimney. (See id. ¶¶ 214–

16, 218–21, 225–27, 229, 231.) Plaintiffs alleged that they were denied their appeal request related to the roof orders, and that the City's facially neutral policy of requiring "perfect" conditions is above minimum standards and increases costs such that it affects the cost of housing for all tenants. (See, e.g., id. ¶¶ 222, 228, 232.) In addition, Plaintiffs alleged, a March 2014 written notice regarding Plaintiffs' 26th Street East property listed code deficiencies that were non-existent or not sufficiently specific. (Id. ¶ 239.) For example, Plaintiffs asserted that the claimed mice infestation was not "widespread and severe" as required for extermination under the housing code, the smoke detector was operational, and a lead abatement specialist was unnecessary when there were only three small areas that needed touch-up paint. (See, e.g., id. ¶¶ 240–44.) Plaintiffs alleged that their appeal requests regarding this notice were ignored, and that Regulatory Services' policies raised the minimum standards and impacted affordable housing by raising costs. (See id. ¶¶ 245–52.) Plaintiffs made similar allegations regarding "heavy code enforcement," lack of specificity, inaccuracy, and denial of appeal rights relating to June 2014 notices of claimed deficiencies at Plaintiffs' 1st Avenue property. (See id. ¶¶ 258–82.) Finally, Plaintiffs alleged that Regulatory Services failed to obtain consent to inspect certain properties, "demanded that Plaintiff coerce consent from protected class tenants," failed to disclose the City's "ulterior motive[]" to remove rental units from available affordable housing stock, and failed to cite Plaintiffs' tenants for violations that are the tenants' responsibility. (See id. ¶¶ 283–93.)

According to the First Amended Complaint, the City does not apply these heightened housing standards and policies to its "sister government agency," the Minneapolis Public

Housing Agency ("MPHA")—which also provides affordable housing to low-income individuals and protected class tenants—even though the MPHA is under-funded and has a significant volume of code violations in its housing units. (See id. ¶¶ 310–11, 313, 319–24.) Rather, Plaintiffs alleged, the City applies a preferential standard to the MPHA in order to enhance MPHA's competitive position, and those standards are the City's actual "minimum housing standards." (See id. ¶¶ 316–18, 327.) Plaintiffs stated that a viable alternative to the City's application of heightened standards as discussed above would have been to follow these minimum standards or to conduct "legitimate" AIs to identify barriers to affordable housing created by the City's policies related to the for-profit low-income rental market and then take action to eliminate those barriers. (See id. ¶¶ 328–30.)

As a result of application of the heightened standards, Plaintiffs claimed to have suffered interference with their business operations, loss of opportunities to rent, loss of profits, attorney's fees, loss of opportunities to add rental units to their portfolio, harassment, humiliation, and embarrassment. (See id. ¶¶ 301–03.) Plaintiffs asserted that the increase in operating costs had to be spread out over all of their units, thereby affecting the cost of housing for all tenants, (see, e.g., id. ¶ 299), and that Defendants' actions and heightened policies are "a significant disincentive" to continue providing low-income rental housing in Minneapolis or to expand their portfolio in response to the high demand for such housing, (see id. ¶¶ 304–05). Moreover, Plaintiffs claimed that after they filed this lawsuit on July 30, 2014, Regulatory Services "commenced an increased course of intimidation and retaliation against Plaintiffs." (See id. ¶¶ 354–61, 363–68, 373–76.)

In their First Amended Complaint, Plaintiffs asserted six claims against Defendants.[1] In Count I, Plaintiffs sought a declaratory judgment that "Minneapolis is legally bound by HUD's Disparate Impact Rule," that "Minneapolis is prohibited by its contract with HUD from challenging disparate impact unless it forgoes . . . federal funding," and that the City's obligation to affirmatively further fair housing requires it to conduct AIs pursuant to the FHA and HUD and to eliminate barriers to fair and affordable housing. (Id. ¶¶ 384–86.) Count II sought injunctive relief under the FHA, prohibiting "the City's unlawfully heightened inspections and standards, heavy code enforcement, rental licensing and threats of license revocations, denial of appeal rights and other challenged housing policies and actions." (Id. ¶ 395.) In Count III, Plaintiffs asserted disparate treatment and disparate impact claims under the FHA. (See id. ¶¶ 401–20.) More specifically, they alleged that the City's facially-neutral housing policies and actions have blocked, denied, or impeded the provision of housing on the basis of protected status and have had a disparate impact on protected classes, and that Defendants intended that the policies would have such an impact. (See id. ¶¶ 403–05, 413.) The remaining claims—for First Amendment retaliation, violation of the Fourteenth Amendment, and violation of the duty to affirmatively further fair housing—were brought under 42 U.S.C. § 1983. (See id. ¶¶ 461–85.)

---

[1] The First Amended Complaint originally asserted nine causes of action, but Plaintiffs dropped their claims in Counts IV, V, and VI. (See Pls.' Mem. of Law in Opp. to City Defs.' Mot. for J. on the Pleadings [Doc. No. 29] at 2.) Plaintiffs also initially asserted one claim against HUD and its Secretary, but those parties have been dismissed from this case [Doc. Nos. 34, 36].

Defendants moved for judgment on the pleadings, and on August 24, 2015, the Court dismissed each of Plaintiffs' claims with prejudice, with the exception of Counts II and III—the claims for injunctive relief and violation of the FHA, respectively—to the extent that they were based on a theory of disparate impact. Ellis v. City of Minneapolis, No. 14-cv-3045 (SRN/JJK), 2015 WL 5009341, at *18 (D. Minn. Aug. 24, 2015). Relevant to the present matter, the Court found that Plaintiffs had failed to plead sufficient facts to support a disparate impact claim in light of the standards enunciated by the U.S. Supreme Court in Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507 (2015). Ellis, 2015 WL 5009341, at *12. In particular, this Court determined that Plaintiffs failed to adequately plead a prima facie case of disparate impact because they failed to allege, with sufficient factual support, that they were prevented from renting any of their units or that any tenants were displaced—i.e., the First Amended Complaint did not contain any plausible allegations that the City's alleged heightened enforcement of the housing code had caused any adverse impact on a protected class. Id. at *10. The Court also held that Defendants had demonstrated that they would be able to satisfy their burden to prove that the challenged practices were necessary to achieve a legitimate, nondiscriminatory interest (here, ensuring compliance with health and safety codes). Id. at *11. Finally, this Court held that Plaintiffs had not sufficiently alleged the existence of any viable alternative means for the City to accomplish its legitimate policy objectives. Id. at *12. Despite these shortcomings, the Court dismissed the disparate impact claim without prejudice and allowed Plaintiffs thirty days to amend the claim in light

of Texas Department of Housing, which was issued while Defendants' motion was pending. Id. Likewise, because Plaintiffs' claim for injunctive relief under Count II was not an independent cause of action, but rather was dependent upon the success of Count III, it also was dismissed without prejudice. Id. at *14.

### B. Plaintiffs' Second Amended Complaint

Plaintiffs filed their Second Amended Complaint on September 23, 2015, asserting a single cause of action for violation of the FHA, based on a theory of disparate impact. (See Second Am. Compl. ¶¶ 378–405.)[2] In addition to the allegations described above, Plaintiffs' complaint now states that four rental units in their 26th Street East and 1st Avenue North properties remained vacant from the fall of 2014 through September 2015 due to Defendants' false and unclear claims of noncompliance with certain codes. (See id. ¶¶ 17–20, 311–20.) Plaintiffs also allege that they have received calls from potential tenants, who are predominantly protected-class members, seeking to rent those units, (id. ¶22), and that Plaintiffs' inability to rent the units because of Defendants' policies has injured Plaintiffs and the prospective tenants, (see id. ¶¶ 23–25). In addition, Plaintiffs allege generally that Defendants' policies targeted at low-income rental homes, including an increase in code enforcement and rental unit license revocations, have caused displacement of protected class members and the unavailability of rental units for those individuals. (See id. ¶¶ 121–22, 383.)

---

[2] Plaintiffs included their request for injunctive relief, which was Count II in their First Amended Complaint, as part of the FHA claim. (See Second Am. Compl. ¶¶ 399–403.) Because Plaintiffs' ability to obtain injunctive relief is dependent upon the success of the FHA claim, which will be dismissed as discussed herein, their request is denied.

Another addition to Plaintiffs' pleadings is an attachment (Exhibit Y) called "City of Minneapolis: Where We Are," which is "a report on the City of Minneapolis' progress in working toward six major goals" and includes "a personal and subjective assessment of [the] community's achievements and shortcomings from people who live and work in Minneapolis" and "their constructive suggestions." (Second Am. Compl. ¶ 123 & Ex. Y at 2.) Plaintiffs allege that City representatives "dominated the membership" of this group. (Id. ¶ 125.) And, according to Plaintiffs, Defendants implemented the challenged housing policies to fulfill the needs noted in the report—including to "make it more expensive and harder to rent out single-family homes," which are the type of homes disproportionately needed by protected class members. (See id. ¶¶ 48, 124, 126–28.)

Defendants filed their second Motion for Judgment on the Pleadings on November 20, 2015, seeking dismissal of Plaintiffs' Second Amended Complaint. The matter was heard on January 8, 2016.

### III.   DISCUSSION

Defendants have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. "Judgment on the pleadings is appropriate if there is no material issue of fact to be resolved and the moving party is entitled to judgment as a matter of law." Buddy Bean Lumber Co. v. Axis Surplus Ins. Co., 715 F.3d 695, 697 (8th Cir. 2013). Rule 12(c) motions are governed by the same standards that apply to motions to dismiss brought under Rule 12(b)(6) for failure to state a claim. Gallagher v. City of Clayton, 699 F.3d 1013, 1016 (8th Cir. 2012). The Court assumes the facts in the

Complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff.  Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986).  However, the Court need not accept as true wholly conclusory allegations, see Hanten v. Sch. Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions the plaintiff draws from the facts pled, Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990).  In addition, the Court ordinarily does not consider matters outside the pleadings.  See Fed. R. Civ. P. 12(d).  The Court may, however, consider exhibits attached to the complaint and documents that are necessarily embraced by the pleadings, Mattes v. ABC Plastics, Inc., 323 F.3d 695, 697 n.4 (8th Cir. 2003), and may also consider public records, Levy v. Ohl, 477 F.3d 988, 991 (8th Cir. 2007).

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  The U.S. Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), clarified that this Rule does not require that a complaint contain "detailed factual allegations," but it does require that it contain facts with enough specificity "to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.  In other words, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." Id. at 556. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555).  Thus, to survive a

motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.[3]

The only cause of action remaining in this case is Plaintiffs' claim that Defendants' alleged heightened enforcement of the housing code has had a disparate impact on protected class members in violation of the FHA. As this Court discussed in its August 24 Order in this case, "[t]he Fair Housing Act . . . prohibits property owners and municipalities from blocking or impeding the provision of housing on the basis of race, color, religion, sex, familial status, or national origin." Gallagher v. Magner, 619 F.3d 823, 831 (8th Cir. 2010) (citing 42 U.S.C. § 3604(a)–(b)). And, the U.S. Supreme Court in Texas Department of Housing confirmed that disparate impact claims are cognizable under the FHA. 135 S. Ct. at 2525. Such claims are analyzed under a three-part burden-shifting framework. Id. at 2514. "[A] plaintiff first must make a prima facie showing of disparate impact" by "'proving that a challenged practice caused or predictably will cause a discriminatory effect.'" Id. (quoting 24 C.F.R. § 100.500(c)(1) (2014)). If a plaintiff establishes a prima facie case, "the burden shifts to the defendant to 'prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.'" Id. at 2515 (quoting 24 C.F.R. § 100.500(c)(2)). "Once a defendant has satisfied its burden at step two, a plaintiff may 'prevail upon proving that the substantial, legitimate,

---

[3] Plaintiffs argue that the Court should not apply the "plausibility" standard articulated by the Supreme Court in Iqbal and Twombly, and instead should apply a more lenient standard. (See Pls.' Opp. at 8–13.) However, as Plaintiffs note, the Eighth Circuit has adopted this standard, (id. at 13), and this Court is bound to apply it.

nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.'" Id. (quoting 24 C.F.R. § 100.500(c)(3)).

Defendants argue that Plaintiffs' claim fails at each step of the analysis. (See Defs.' Mem. of Law in Supp. of Mot. for J. on the Pleadings [Doc. No. 42] ("Defs.' Mem."), at 19–33.) Plaintiffs, on the other hand, argue that they are not required to plead a prima facie case of disparate impact and that, even if they were, they have adequately alleged facts supporting each prong of the burden-shifting framework. (Pls.' Mem. of Law in Opp. to Defs.' Mot. for J. on the Pleadings [Doc. No. 43] ("Pls.' Opp."), at 8, 19–32.) Because this Court finds that a plaintiff must adequately allege—at the pleading stage—facts demonstrating a causal connection between the challenged policy and the alleged disparity, and because the Court agrees that Plaintiffs have failed to do so, the Court need not address whether Plaintiffs have adequately alleged that Defendants' policies were arbitrary or that there are viable and less discriminatory alternatives for achieving Defendants' objectives.

### A. Pleading Requirements

As a preliminary matter, Plaintiffs claim that the Supreme Court's decision in Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002), stands for the proposition that a plaintiff need not plead a prima facie case of disparate impact in a discrimination case in order to survive a motion to dismiss. (Pls.' Opp. at 8.) However, not only is Swierkiewicz an employment discrimination case, it pre-dates Iqbal and Twombly, and—more importantly—Texas Department of Housing, in which the Court specifically stated that "[a] plaintiff who fails to allege facts at the pleading stage or produce statistical evidence

13

demonstrating a causal connection cannot make out a prima facie case of disparate impact." 135 S. Ct. at 2523 (emphases added). In other words, a plaintiff's complaint is insufficient if it does not point to a defendant's policy and purported disparity and allege facts that show a causal connection. See id. at 2523–24. As the Court noted, "[this] robust causality requirement ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." Id. at 2523 (quoting Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 653 (1989)). According to the Court, "[w]ere standards for proceeding with disparate-impact suits not to incorporate at least [these] safeguards . . . , then disparate-impact liability might displace valid governmental and private priorities . . . ." Id. at 2524. Therefore, this Court is not persuaded by Plaintiffs' argument and finds that, in order to survive a motion for judgment on the pleadings on a disparate impact claim under the FHA, a plaintiff must adequately allege facts in the complaint that demonstrate a causal connection between the challenged policy and the alleged discriminatory effect.

    **B.    Causation**

As for pleading causation, Defendants argue that Plaintiffs' vague assertions that they and protected class members have suffered injuries "as a direct result" of the City's ordinances or policies of enforcement are insufficient. (See Defs.' Mem. at 26 (citing Second Am. Compl. ¶ 21).) Defendants assert that Plaintiffs have again failed to adequately allege that any tenant was displaced or that Plaintiffs lost a rental license. (See id. at 27–28.) In fact, Defendants point out, Plaintiffs admit that they continue to rent all but two of

their properties. (Id. at 28 (citing Second Am. Compl. ¶ 13).) And those two properties—26th Street East and 1st Avenue South—either remain vacant because Plaintiffs have refused to allow the City to re-inspect and verify that violations (e.g., mice infestation and improper smoke and carbon dioxide detectors) were corrected, or were inspected at the request of the tenant. (Id. at 21–23 (citing Joint Answer [Doc. No. 39], Ex. H; Second Am. Compl. ¶ 259).) Finally, Defendants argue that the statements of personal opinion made by community members in the "Where We Are" Report does not establish causation. (Id. at 27.)

In opposition, Plaintiffs assert that they have sufficiently pled causation by alleging facts showing that Defendants have contributed to the shortage of available protected class housing. (Pls.' Opp. at 30.) In particular, they point to their allegations that Defendants have increased fees and license revocations, engaged in a hostile approach when dealing with for-profit providers of affordable rental housing, applied heightened housing standards, acknowledged that affordable housing is kept out of communities through zoning decisions and the imposition of costs, acknowledged that dealing with substandard properties sometimes has a disproportionate impact on protected class members, ignored the recommendations of the 2001 AI and 2002 AI Action Guide, forced removal of affordable rental units from the market, and released the "Where We Are" Report detailing community members' opinions related to the City's housing policies. (See id. (citing Second Am. Compl. ¶¶ 48, 60, 93, 98–99, 108–09, 121–28, 131–32, 144–45).) Plaintiffs also rely on their allegations that the City's policies have caused certain of Plaintiffs' rental units to

remain vacant and have increased Plaintiffs' costs, caused loss of rental income, and impacted their ability to provide additional housing for protected class members. (Id. at 32 (citing Second Am. Compl. ¶¶ 16–25, 190, 239, 255–57).)

The Court finds that Plaintiffs have failed to adequately allege facts that plausibly demonstrate a causal link between any of Defendants' purportedly unlawful policies and the alleged disparity, as required by Texas Department of Housing. First, many of the paragraphs in Plaintiffs' Second Amended Complaint that they rely on to establish causation are identical, or nearly identical, to allegations included in the First Amended Complaint. (Compare Second Am. Compl. ¶¶ 16–25, 48, 60, 93, 98–99, 108–09, 121–28, 131–32, 144–45, 190, 239, 255–57, with First Am. Compl. ¶¶ 30–33, 67, 100, 105–06, 115–16, 130–31, 143, 189, 238, 254–56.) Because the Court already held that the paragraphs in the First Amended Complaint were insufficient to allege causation, the corresponding paragraphs in the Second Amended Complaint also are insufficient for the reasons stated in the Court's August 24 Order.

Second, the new allegations in the Second Amended Complaint do not cure the problem identified by the Court in the August 24 Order—i.e., that Plaintiffs' First Amended Complaint failed to allege, with sufficient factual support, that Plaintiffs have been prevented by Defendants' purportedly unlawful policies from renting any of their units or that, as a result of Defendants' policies, any tenants had been displaced. Rather, the new allegations still do not plausibly connect any policies to the alleged disparity. For example, Plaintiffs now allege that four of their rental units remained vacant for a year, despite

16

expressed interest from protected-class members, due to Defendants' false and unclear claims of noncompliance with applicable codes, (see Second Am. Compl. ¶¶ 17–20, 22–25, 311–20), but Plaintiffs also allege that "[t]he rental units have been at all times <u>substantially</u> compliant with all appropriate codes," (<u>id.</u> ¶ 17 (emphasis added)). In other words, Plaintiffs admit that the units were not up to code. And, as to one of those properties, the City's inspection of the rental unit was initiated <u>by the tenant</u>. (<u>Id.</u> ¶ 259.)

As for Plaintiffs' general allegations that Defendants' policies have "directly caused" displacement of protected class members and the unavailability of rental units for those individuals, (<u>see</u> <u>id.</u> ¶¶ 121–22, 383), such statements are too conclusory to raise a right to relief above the speculative level. Likewise, Plaintiffs' allegation that Defendants implemented their alleged policies to further the "Where We Are" Report's "goal" of "mak[ing] it more expensive and harder to rent out single-family homes," (<u>see</u> <u>id.</u> ¶¶ 48, 123–28), is misplaced and based on pure conjecture. The statements contained in the Report were not "goals" but rather summaries of the "personal and subjective assessment of [the] community's achievements and shortcomings" and "constructive suggestions" gleaned from conversations held by over 250 "people who live and work in Minneapolis." (<u>Id.</u>, Ex. Y, at 2.) And, the people in the conversations included representatives not only from the City, but also from religious organizations, schools, a law firm, companies, and public agencies, among other organizations. (<u>See</u> <u>id.</u>, Ex. Y, at 9–14.) More importantly, even if Defendants did seek to make it more expensive and harder to rent out single-family homes, and did implement policies to that effect, and did achieve their goal, there still are no factual

17

allegations contained in Plaintiffs' Second Amended Complaint that plausibly suggest that—as a result—Plaintiffs have lost a rental license or otherwise been unable to rent a unit, or that any protected-class tenant has been displaced.

Plaintiffs rely heavily on the Eighth Circuit's opinion in Gallagher v. Magner, 619 F.3d 823 (8th Cir. 2010), to save their Second Amended Complaint. (See Pls.' Opp. at 14–16, 23–24.) In that case, the Eighth Circuit reversed the district court's grant of summary judgment in favor of the City of St. Paul on the landlord-plaintiffs' disparate impact claim under the FHA. Gallagher, 619 F.3d at 828–29. After determining that the landlords' allegations and evidence of aggressive housing code enforcement were sufficient to identify a facially-neutral policy or practice, the court concluded that the landlords also had produced sufficient evidence to raise an issue as to whether the aggressive enforcement had resulted in a disproportionate adverse effect on racial minorities. See id. at 834–35; see id. at 836 n.4 ("[M]erely showing that there is a shortage of housing accessible to a protected group is insufficient to establish a prima facie case for a disparate impact claim. Plaintiffs must also show that such a shortage is causally linked to a neutral policy, resulting in a disproportionate adverse effect on the protected population."). In particular, the landlords had produced evidence demonstrating that "[t]he City experienced a shortage of affordable housing," "[r]acial minorities . . . made up a disproportionate percentage of lower-income households in the City that rely on low-income housing," "[t]he City's aggressive Housing Code enforcement practices increased costs for property owners that rent to low-income

tenants," and "[t]he increased burden on rental-property owners from aggressive code enforcement resulted in less affordable housing in the City." Id. at 834–35.

Plaintiffs' reliance on Gallagher is misplaced. First, Gallagher was decided prior to Texas Department of Housing, in which the Supreme Court announced a new "robust causality requirement" for pleading disparate impact claims under the FHA and expressly cast doubt on Gallagher, stating: "Although the Court is reluctant to approve or disapprove a case that is not pending, it should be noted that [Gallagher] was decided without the cautionary standards announced in this opinion and, in all events, the case was settled by the parties before an ultimate determination of disparate-impact liability." Tex. Dep't of Hous., 135 S. Ct. at 2524.

Second, to the extent that Gallagher remains informative, it is distinguishable from the present matter. In that case, the landlords had produced evidence that the City of St. Paul's enforcement of the housing code led to "a substantial increase in costs, resulting in evictions for tenants and 'forced sales' of their properties in some cases." Gallagher, 619 F.3d at 835 (emphasis added). In other words, there was evidence that the City of St. Paul's policies resulted in a decrease in the availability of affordable housing. See id. at 835–36. Here, as discussed above, the facts alleged in the Second Amended Complaint are insufficient to raise a reasonable expectation that discovery would reveal similar evidence in this case.

Accordingly, in light of the cautionary standards enunciated in Texas Department of Housing, this Court finds that Plaintiffs' Second Amended Complaint does not contain

sufficient facts to state a plausible claim for relief under the FHA. Rather, as Defendants state: "Despite its extraordinary length—running 405 paragraphs over 103 pages—Plaintiffs' Second Amended Complaint still offers only vague, unsubstantiated conclusions and fails to provide enough factual support to overcome the robust causality requirement." (Defs.' Mem. at 2.) Therefore, Defendants are entitled to judgment on the pleadings.

## IV. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. Defendants' Motion for Judgment on the Pleadings [Doc. No. 40] is **GRANTED**; and

2. Plaintiffs' Second Amended Complaint [Doc. No. 38] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 28, 2016          s/Susan Richard Nelson
                                              SUSAN RICHARD NELSON
                                              United States District Judge